**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9            IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12   ANDRE D. McCLENDON,                  NO. C 09-0647 MMC (PR)

13                 Petitioner,            **ORDER DENYING PETITION FOR**
                                          **WRIT OF HABEAS CORPUS;**
14       v.                               **DENYING CERTIFICATE OF**
                                          **APPEALABILITY; DIRECTIONS TO**
15   VIMAL SINGH, Warden                  **CLERK**

16                 Respondent.
     _____/

17                     **I.  INTRODUCTION**

18       Before the Court is the "[Second] Amended Petition for Writ of Habeas Corpus"

19   (hereinafter, "SAP"), filed January 20, 2012, pursuant to 28 U.S.C. § 2254, by Andre D.

20   McClendon, who proceeds pro se, challenging the validity of his 2003 conviction in Alameda

21   County Superior Court, for torture and child abuse.  (Doc. No. 16.)  Respondent has filed an

22   Answer (Doc. No. 22)[1] and Petitioner has filed a Traverse (Doc. No. 27).

23       For the reasons set forth below, the Petition will be DENIED.

24
25
26
27   _____

28       [1]  Petitioner initially named James E. Tilton, former Secretary of the California
     Department of Corrections and Rehabilitation, as Respondent in this action.  Pursuant to Rule
     25(d) of the Federal Rules of Civil Procedure, Vimal Singh, the current Warden of California
     Medical Facility, wherein Petitioner is incarcerated, is hereby substituted as Respondent.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.  BACKGROUND

A.  **Statement of Facts**

The California Court of Appeal summarized the facts and procedural history of

Petitioner's case as follows:[2]

> This appeal arises from the serious and prolonged burning on the arm, stomach and thighs of a young girl, (the victim), who was five years old at the time of the crimes and seven at the time of trial.  The victim is the daughter of [codefendant Delia] Cuellar, [Petitioner's] girlfriend at the time.  [Petitioner] was charged with both child abuse and torture; Cuellar was charged with child abuse only.

### 1.  Prosecution Evidence

> On the morning of January 2, 2002, Cuellar called the Berkeley Police Department to say that she was locked inside her home and could not get out. Officer David Frederick found Cuellar and her three children locked inside the house, which had doors that locked from both inside and outside.  Frederick got a house key from Cuellar's landlord, who lived nearby, and released them. Cuellar said she had been in a fight with her boyfriend, [Petitioner], and that afterwards [Petitioner] locked them in the house and took the keys.  Cuellar said that [Petitioner] had beaten her, and she was scared and wanted to leave.

> Frederick could see that one of the children, the victim, had a serious burn that was blistering on her arm.  The victim told him that [Petitioner] had burned her and showed him serious burns on her thighs as well.  The burns were about the size of a silver dollar.

> Cuellar later signed a written statement, describing how [Petitioner] had used a heated pipe to burn the victim.  [Petitioner] had ordered Cuellar to heat up the pipe on the stove and took it from Cuellar when it was hot.  Cuellar showed Frederick the pipe, which was a three-foot-long piece of hollow iron pipe, about an inch in diameter.  The pipe had a burn mark at one end.

> The following day, Berkeley Police Officer Marianne Jamison took over the investigation.  Officer Jamison located Cuellar at the East Oakland Pediatric Center, where Cuellar had taken the victim for treatment.  Officer Jamison was surprised to overhear Cuellar telling Dr. Carol Glann that Cuellar's boyfriend had heated up a rod, and then somehow accidentally dropped it on the victim, causing burns on her thigh and arm.  This was contrary to Cuellar's previous statements, in which she said that [Petitioner] told her to heat up the pipe, then took it away from her and used it to burn the victim.  Officer Jamison told Cuellar that her new claims that the burns were accidental did not make sense and that Jamison would be taking the victim into protective custody.

> Officer Jamison took the victim to a child abuse center [CALICO] for an interview.  The victim told the interviewer that [Petitioner] had burned her

_____

[2] See Index of Records Lodged in Support of Answer to the Second Amended Petition for Writ of Habeas Corpus (hereinafter, "Index") (Doc. No. 22-2), Ex. A.

with a hot "stick" which he told the victim's mom to put into the fire.  As he did this, her mother stood by, crying.

Officer Jamison then drove the victim to a foster home, and on the way, the victim talked about the burns.  The victim said her mother had woken her up, told her she had to talk to [Petitioner], and then took her into the living room. [Petitioner] demanded that the victim take off all her clothes.  The victim asked to keep on her panties, and [Petitioner] agreed.  [Petitioner] then asked the victim questions about the mess in her bedroom, including the fact that a drawer full of clothes had been pulled out onto the floor.  [Petitioner] claimed he had set up video cameras all throughout the house, and one of the videotapes showed the victim spilling the clothes out on the floor.  [Petitioner] was holding a hot metal pipe, and after each question or comment, he would touch her with the pipe.  The victim was screaming and crying.  Her mother was just standing there, not doing anything to help her.  Afterwards, [Petitioner] hit the victim in the head with the pipe, forced her head into the toilet while flushing it, and forced her to sit in cold water in the bathtub.

The victim testified at trial in accordance with her prior statements.  The victim drew a picture, showing [Petitioner] holding a hot metal stick and touching it to her arm, legs, and stomach.  Her mother was there, crying, but she did not do anything to stop [Petitioner] from burning her.

Dr. Glann testified that she found numerous serious and suspicious burns on the victim's body.  There were circular burns on her legs which had blistered, indicating that the burns were deep and serious.  There was also a circular burn on her hand.  There was a large, oblong burn on the victim's arm, which was blistered over a wide area.  All the burns were relatively recent and were in the same stage of healing, indicating they had been inflicted at about the same time, within a day or two prior to Glann's first examination of the victim. Glann's opinion was that the burns could not have occurred accidentally.  When Glann told Cuellar this, Cuellar became upset and insisted there had been an accident.  Glann asked the victim what had happened, but the victim did not speak.

About a week after the burns were inflicted, Glann examined the victim again. Glann found another circular burn on the victim's stomach, which she had not seen before; this burn had not been properly cleaned or treated and was now crusted.  There was also a swollen bruise over the victim's right eye.

Dr. James Crawford, the medical director of the Center for Child Protection at Children's Hospital, testified as an expert on pediatric medicine and child abuse.  Crawford noted there were multiple serious burns on different parts of the victim's body, where there were burns similar to branding.  Some of the burns were circles and others were flatter; the burns had apparently been caused by some hot hollow tube-like object, such as the metal pipe taken from the home.  Even without taking into account the history of the injuries provided by the victim, it was obvious to Crawford that the burns were intentionally inflicted, by the sequential application of the same very hot object to different parts of the girl's body.

**United States District Court**
For the Northern District of California

**2.      Defense Evidence Presented by Cuellar**

Cuellar testified in her own defense.

Cuellar met [Petitioner] in 1998, and began dating him; at first, he seemed kind and understanding.  They had similar family histories, because both of their fathers had been abusive, while their mothers had been submissive.

[Petitioner] later became abusive, and he repeatedly abused her physically and beat her over the years.  On one occasion, [Petitioner] bent back Cuellar's finger and struck her with a toy.  On another, he claimed he had pictures that proved she was cheating on him and pushed her onto the sofa when she demanded to see the supposed pictures.  He then hit her repeatedly in the head. He later questioned Cuellar while beating her with a metal broomstick until it bent.  On yet another occasion, they got into a fight while they were watching a televised boxing match between Oscar de la Hoya and another boxer.  Cuellar supported de la Hoya, who was Hispanic like herself.  [Petitioner] supported de la Hoya's opponent, who was African-American like himself.  The situation got so bad that [Petitioner] ordered Cuellar to boil some water on the stove so that he could pour it on her.  Cuellar boiled the water to avoid getting beaten up again, but [Petitioner] calmed down and did not pour the water on her.

[Petitioner] however would beat her often, at least once a month, later increasing to twice a month.  He beat her with a belt, a belt buckle, pots and pans, a cutting board, and some electrical cord.  He hit her in the mouth with a piece of wood, causing a permanent scar on her lip.  He also took more and more control over her life, dominating and bullying her, and taking away her car keys and house keys.

Once in 2000, [Petitioner] began beating the kids with a belt.  Cuellar yelled at him, whereupon he began beating her with the belt in the bathroom, causing her to fall on the toilet seat and break a towel rod.  [Petitioner] then began hitting her with the towel rod.  Finally, [Petitioner] left, and Cuellar called the police, who took a report.  Cuellar saw [Petitioner] beat the children with a belt on other occasions.  [Petitioner] beat her while she was pregnant with their child, Samaya.  He also talked about killing her.  Cuellar tried to leave [Petitioner] and stay with his sister, Sherrelle, in Southern California.  Sherrelle was sympathetic and tried to mediate between Cuellar and [Petitioner], who had threatened to kill her if she did not return.

On January 1, 2002, [Petitioner] went over to the home of his mother, Nancy Jackson, in Hayward to see her new car.  Unbeknownst to Cuellar, [Petitioner]  had secretly set up a video camera in the house, to keep her and the kids under surveillance while he was gone.  When [Petitioner] got back later that evening, he asked Cuellar if the victim had done her homework and gone to bed the way he had ordered.  Cuellar said yes.  [Petitioner] got a videotape out of the machine and watched it.  It showed the victim telling Cuellar that Samaya had been playing with the dresser drawers and had pulled one of them out.  Cuellar then slapped Samaya on the hand three times, and they all put the clothes back in the drawer.  [Petitioner] got mad and claimed that Cuellar was abusing Samaya and was treating the victim better than Samaya.  [Petitioner] claimed that the victim pulled the drawer out and blamed it on Samaya, and he told Cuellar to wake up the victim for questioning, which Cuellar did.

4

United States District Court
For the Northern District of California

[Petitioner] told the victim that he had cameras all over the house and knew everything that was going on.  He asked the victim who had pulled out the drawer, and the victim said it was Samaya.  [Petitioner] asked Cuellar if the victim was lying, and Cuellar got scared and said yes to appease him.  The victim then said she had done it.  [Petitioner] then began making threats, and Cuellar thought he was about to kill her.

[Petitioner] ordered Cuellar to go get his "stick" by which he meant the metal pipe which he recently had found outside.  [Petitioner] ordered Cuellar to heat the "stick" on the stove.  One end of the pole got dark from holding it over the flame.  [Petitioner] snapped his fingers and ordered Cuellar to give him the heated pole.

[Petitioner] began pointing his heated "stick" at Cuellar and the victim while lecturing them.  The victim got scared and started crying.  [Petitioner] began jabbing at the victim with the hot pole; the victim was not wearing any pajamas.  The victim began screaming.  [Petitioner] ordered the victim into the bathroom and then pushed the victim's head into the toilet.  Afterwards, Cuellar noticed burns on the victim's body.

The next day, [Petitioner] left for a job interview.  However, he locked Cuellar and the children in the house.  She called a person at her mosque, Keith Muhammad, for advice, telling him that [Petitioner] had burned her child and they needed to get out of the house.  Muhammad told her to call the police.  Cuellar called a child abuse hotline to see if the kids might be taken away from her.  The person at the child abuse hotline said they might.  Eventually, Cuellar called the police anyway.

The police arrived and released Cuellar and the kids.  Cuellar told the police that [Petitioner] had burned the victim.  Later, she took the kids and went to stay with [Petitioner's] grandmother.  [Petitioner's] family became concerned about what she would say, and [Petitioner] urged her to say that the victim's injuries were only an accident.  She tried to do so, but the doctor and police saw through that story.  [Petitioner's] sister and mother contacted her and asked her to lie about what had happened.  At first, Cuellar agreed but later she decided to tell the truth.

Cuellar also called three supporting witnesses.  Cuellar's cousin Evelyn Flores testified that [Petitioner] abused Cuellar, who showed obvious injuries from the abuse, such as bruises and a black eye.  Flores testified that Cuellar repeatedly tried to get away from [Petitioner].

Yenci Santiago, a friend of Cuellar's, confirmed that Cuellar showed injuries such as bruises, apparently resulting from physical abuse by [Petitioner].  Santiago saw Cuellar with the victim, both before and after the victim was burned.  The victim never showed any fear of Cuellar, and they had a good relationship.  On cross-examination, Santiago could not recall whether she had told a defense investigator that Santiago had never seen signs that [Petitioner] was abusive.

Linda Barnard, a marriage therapist with a Ph.D., testified as an expert in the area of forensic psychology and domestic violence.  Barnard concluded from her interviews with Cuellar and her therapist Dr. Rose, as well as a review of medical and police reports, that Cuellar was a battered woman who was suffering from posttraumatic stress disorder as a result of repeated incidents of

5

domestic violence.  Cuellar's behavior was consistent with battered woman syndrome.

**3.      Defense Evidence Presented by [Petitioner]**

[Petitioner] presented the testimony of a psychologist and family members, as well as his own testimony.

Psychologist Ronald McKinzey testified that children are suggestible, and they can sometimes testify regarding implanted memories, or even lie. McKinzey however had never met the victim or examined her.

[Petitioner's] sister, Sherrelle [Muhammad], testified that Cuellar and [Petitioner] had a rocky relationship at times, but Cuellar never told her about any physical abuse on the part of [Petitioner].  She saw Cuellar "smack" the kids.

Cuellar told Sherrelle that Cuellar had burned the victim accidentally and that she was planning to take her to the doctor.  Cuellar said she had coached the victim about what to tell the doctor and the police, and the victim was smart and would say the right things.  Subsequently, the grandmother of [Petitioner] and Sherrelle, Prinzola Moreland, warned Sherrelle that the victim's injuries did not appear to be accidental.  Sherrelle later talked to [Petitioner], who said he was not at home at the time of the burning.  According to Sherrelle, Cuellar's story changed over time, so that she eventually said "we" burned the victim, meaning that [Petitioner] had also been a participant.  Sherrelle later saw a police report and was upset by its contents.  She asked Cuellar if the report was true, and Cuellar said she had lied in an effort to avoid losing custody of her kids.

[Petitioner's] brother, Jeffrey [McClendon], testified that he had been with [Petitioner] and Cuellar while they watched a televised boxing match between a Hispanic boxer and an African-American boxer.  There was no argument between [Petitioner] and Cuellar, and no one ever told him that [Petitioner] beat Cuellar or the kids. Jeffrey trusted [Petitioner] with the care of his own kids, and there had never been any problems of beating or abuse. [Petitioner] told Jeffrey that Cuellar had burned the victim by accident while [Petitioner] was not at home.

[Petitioner's] mother, [Nancy] Jackson, testified that [Petitioner] came over to her house in Hayward on the evening of New Year's Day, 2002, to exchange presents and see her new car.  [Petitioner] seemed fine, and he did not say anything about a fight with Cuellar, only that she had been acting strangely.

The next day, Jackson talked to Cuellar, who was staying at Moreland's home. Cuellar said the victim had been accidentally burned.  Cuellar told Jackson that Cuellar could not find her house keys and she panicked, so she called the police to get her out of the house.  Jackson did not talk to the victim and did not see the burns.  After Cuellar had been arrested and after Jackson gave Cuellar money to make bail, Cuellar's story changed, and she claimed [Petitioner] had burned the victim.

Jackson and Cuellar went to see William DuBois, [Petitioner's] second lawyer.  Cuellar told DuBois that [Petitioner] was being framed and that a pipe

6

being used to light the fireplace had accidentally dropped onto the victim. Jackson heard various versions from Cuellar, including that she had burned the victim, or "they" had burned her accidentally, or [Petitioner] burned her accidentally, or [Petitioner] burned her. Each time, Cuellar claimed she was telling the truth. Jackson said Cuellar never complained to her about beatings by [Petitioner], and she never saw any marks of such beatings on her. It was true that Cuellar had a scar on her lip, but Jackson thought Cuellar had that scar as long as Jackson had known her. Jackson denied that [Petitioner] had been abused as a child, although she and her husband had spanked him with a belt. On cross-examination, Jackson denied that she had spoken with Deputy District Attorney Ursula Dickson about a possible plea agreement for her son and denied telling Dickson that what her son had done was inappropriate or that her son had been abused as a child.

There was also testimony from [Petitioner's] grandmother, Moreland. Cuellar called her from the Berkeley police station on the evening of January 2, 2002, asking if Cuellar and the kids could stay with her because Cuellar and [Petitioner] had had a misunderstanding. There was no mention at that time of the victim being burned. Moreland did not notice any injuries on the victim and did not talk to her that night.

Later, Cuellar told Moreland that Cuellar had burned the victim accidentally and needed to coach the victim about what to say. Moreland objected that this would only confuse the victim, but the victim said she could remember what her mom told her to say. Moreland saw some burn marks on the victim's stomach, but they did not look too serious. Later, Moreland saw photos of the victim's burns, and the photos looked "enhanced" to her, like "vivid red circles," while the injuries Moreland had seen had been less dramatic.

[Petitioner] testified in his own defense. [Petitioner] denied having been abused by either of his parents, who were divorced when he was young. [Petitioner's] father would however sometimes beat him with a belt.

Soon after moving in with Cuellar, [Petitioner] found out that Cuellar sometimes told lies. Cuellar told him the rent for her apartment was $550, and [Petitioner] should pay half. However, he later found out from the landlord that the entire rent was less than $200. The two later moved into a house in Berkeley. The doors in the house were double-keyed, requiring a key to get in or to go out. Both he and Cuellar had keys to the house and their cars.

[Petitioner] denied controlling or dominating Cuellar and denied videotaping her, although [Petitioner] did have a video camera that he had used to videotape a child's birthday party. [Petitioner] denied abusing Cuellar, although they sometimes argued and fought. Once they had a fight and Cuellar kicked at Samaya's stroller, so [Petitioner] knocked her down and stayed on top of her until she stopped fighting.

[Petitioner] was not aware that Cuellar had previously made reports to the police about domestic abuse. He testified that Cuellar got a cut on her lip when she was involved in a car accident while drinking.

Shortly after their second child, Isaiah, was born in November 2001, [Petitioner] was fired from his job. Cuellar's personality changed, and [Petitioner] began making plans to get another job in Sacramento and break up

United States District Court

For the Northern District of California

with Cuellar.  [Petitioner] wanted to take Samaya with him to Sacramento, but Cuellar did not agree.

On the evening of January 1, 2002, [Petitioner] went to his mother's house in Hayward to exchange presents and see her new car.  [Petitioner] denied telling the victim to do any homework while he was away; in fact, school was still out for the holidays.

[Petitioner] talked to Cuellar on his cell phone as he was on the way back from his mother's place, around ten or eleven that night.  Cuellar told him that she had accidentally burned the victim on the legs and stomach with the pipe she used to light their wall heater.  While Cuellar was lighting the heater, the victim walked up and Cuellar told her to go to bed; the victim made a comment, and Cuellar pushed her with the pipe, not remembering that it was hot.

[Petitioner] explained that he had previously found the pipe outside their house, and he brought it inside and put it in the laundry room.  Cuellar sometimes used it to relight the wall heater pilot light.

When [Petitioner] got home, he saw serious burns on the victim's body, but the burns were not as bad as the ones he used to see on accident victims when he had previously worked as an emergency medical technician, so [Petitioner] just put her in a cool bath and put her to bed.  The next morning, [Petitioner] went off for a job interview in Sacramento, and he thought Cuellar would take the victim to the doctor.  [Petitioner] could not remember if he had locked the door when he left that morning.  He called Cuellar again before his interview, and she did not say anything about not being able to find her keys or leave.

[Petitioner] testified he still did not know what had really happened to cause the victim's burns, and he had heard a lot of different stories from Cuellar, who admitted to him that she had lied to the police.  [Petitioner] denied that he told a social worker, Shelly Mazer, that he had burned the victim with the hot pipe.  However, [Petitioner] might have told Mazer that he felt responsible for what happened because Cuellar was in a poor mental state.

### 4.    Prosecution Rebuttal Evidence

Deputy District Attorney Dickson testified on rebuttal that she spoke with [Petitioner's] mother about a possible plea agreement.  Jackson said the consequences being outlined in the plea agreement were too harsh because [Petitioner] had been abused as a child, but Jackson never said that her son was innocent.  Dickson also spoke with the victim several times, and the victim consistently said it was [Petitioner] who had burned her.

Shelly Mazer testified that she was employed by the Alameda County Department of Social Services and had been assigned to investigate the case.  As part of her investigation, Mazer received [Petitioner's] lawyer's permission to talk to [Petitioner].  [Petitioner] told Mazer that he accepted responsibility for the injuries to the victim because he had inflicted them.  [Petitioner] described to Mazer at length how the injuries had occurred.  [Petitioner] had set up his video camera to secretly tape the activities of Cuellar and the kids while he was at his mother's.  Later, [Petitioner] said he watched the tape and saw the victim pull out a drawer and hit Samaya on the head.  Afterwards, [Petitioner]

8

was so enraged that he picked up a pole that was still hot from lighting a furnace and used it to burn the victim.  Then [Petitioner] bathed the victim.  The next day, [Petitioner] hid Cuellar's keys so she could not leave with the kids.  [Petitioner] continually expressed remorse about his actions and said Cuellar had been a great mother to the kids.

**5.      Verdicts and Sentence**

The jury convicted [Petitioner] of torture and child abuse, as charged.  The jury acquitted Cuellar.  [Petitioner] was sentenced by the trial court to a term of life with possibility of parole on the torture count, with sentence on the child abuse count stayed pursuant to [California] Penal Code section 654.

(Index, Ex. A at 1-10.)

**B.      Procedural History**[3]

On August 26, 2003, an Alameda County jury convicted Petitioner of torture and abuse of his girlfriend's five-year-old daughter. (See Index, Ex. A; Ex. K (Clerk's Transcript on Appeal, Vol. II at 27-29); see also Cal. Penal Code §§ 206, 273(a)(1).  The jury further found Petitioner used a deadly and dangerous weapon within the meaning of Penal Code § 12022(b)(1), and personally inflicted great bodily injury within the meaning of Penal Code § 12022.7(a).  (Id.)  On June 8, 2004, the trial court sentenced Petitioner to prison for life with the possibility of parole.  (Id. at 332-35.)

On August 2, 2006, in a reasoned opinion, the California Court of Appeal affirmed the judgment. (Index, Ex. A.)  On November 15, 2006, the California Supreme Court summarily denied the petition for review.  (Index, Ex. F.)  Petitioner subsequently filed a petition for a writ of habeas corpus in the California Supreme Court, which was summarily denied on February 11, 2009.  (Index, Ex. I.)

On February 13, 2009, Petitioner filed his initial Petition for Writ of Habeas Corpus. (Doc. No. 1.)  On September 27, 2010, the Court granted Respondent's Motion to Dismiss the Petition as a "mixed" petition containing both exhausted and unexhausted claims, and directed Petitioner either to file an amended petition that included only his exhausted claims and omit the unexhausted claims, or to file a request for a stay of this matter for the purpose

---

[3] Except as otherwise specified, all transcripts and exhibits cited herein were submitted by Respondent in support of the Answer.

9

1    of his exhausting his unexhausted claims in state court.  (See Doc. No. 10.)  On October 27,

2    2010, Petitioner filed an Amended Petition.  (Doc. No. 11.)

3        On December 13, 2011, the Court granted Respondent's Second Motion to Dismiss

4    the Petition as a "mixed" petition, on the ground that the Amended Petition retained

5    unexhausted claims.  (See Doc. No. 15.)  Petitioner was again directed to either file an

6    amended petition that included only exhausted claims or to file a request for a stay.  (Id.)  On

7    January 20, 2012, Petitioner filed his Second Amended Petition, removing the unexhausted

8    claims.

9                            **III.  STANDARD OF REVIEW**

10       This Court may entertain a petition for a writ of habeas corpus "in behalf of a person

11   in custody pursuant to the judgment of a State court only on the ground that he is in custody

12   in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a);

13   Rose v. Hodges, 423 U.S. 19, 21 (1975).

14       A district court may not grant a petition challenging a state conviction or sentence on

15   the basis of a claim that was reviewed on the merits in state court unless the state court's

16   adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an

17   unreasonable application of, clearly established Federal law, as determined by the Supreme

18   Court of the United States; or (2) resulted in a decision that was based on an unreasonable

19   determination of the facts in light of the evidence presented in the State court proceeding."

20   28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas

21   relief is warranted only if the constitutional error at issue had a "substantial and injurious

22   effect on the verdict."  Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal quotation and

23   citation omitted).

24       A state court decision is "contrary to" clearly established Supreme Court precedent if

25   it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases"

26   or if it "confronts a set of facts that are materially indistinguishable from a decision of [the

27   Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams,

28   529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court

United States District Court
For the Northern District of California

10

United States District Court

For the Northern District of California

1    may grant the writ if the state court identifies the correct governing legal principle from [the

2    Supreme] Court's decisions but unreasonably applies that principle to the facts of the

3    prisoner's case." Id. at 413.  "[A] federal habeas court may not issue the writ simply because

4    that court concludes in its independent judgment that the relevant state-court decision applied

5    clearly established federal law erroneously or incorrectly.  Rather, that application must also

6    be unreasonable." Id. at 411.

7        Section 2254(d)(1) restricts the source of clearly established law to the Supreme

8    Court's jurisprudence.  "[C]learly established federal law, as determined by the Supreme

9    Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme]

10   Court's decisions as of the time of the relevant state-court decision." Id. at 412.  "A federal

11   court may not overrule a state court for simply holding a view different from its own, when

12   the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540

13   U.S. 12, 17 (2003).

14       Where, as in the instant case, the California Supreme Court has summarily denied the

15   petitioner's petition for review and petition for writ of habeas corpus (see Index, Exs. F, I),

16   the Court looks to the last reasoned state court decision, in this instance the opinion of the

17   California Court of Appeal,[4] in conducting habeas review.  See Ylst v. Nunnemaker, 501

18   U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

19                        **IV.  DISCUSSION**

20       Petitioner moves for a writ of habeas corpus on the grounds that: (1) the trial court

21   permitted the introduction of false evidence at trial by both the prosecution and Petitioner's

22   codefendant; (2) Petitioner's trial counsel was ineffective; (3) the prosecutor committed

23   misconduct; and (4) the trial court erred by denying Petitioner's motion to sever Petitioner's

24   _____

25       [4] In its opinion on direct review, the Court of Appeal addressed a number of the
     claims raised in the instant petition.  (See Index, Ex. A.)  The Court of Appeal thus was the
26   highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it
     is the Court of Appeal's decision that this Court reviews herein.  As to the claims for which
27   there is no reasoned opinion available, the United States Supreme Court has recently clarified
     that a federal habeas court, in applying the review provisions of 28 U.S.C. § 2254(d), looks
28   to the result reached by the highest state court, and the absence of reasoning does not prevent
     application of the standard of review set forth in § 2254(d).  See Harrington v. Richter, 131
     S. Ct. 770, 784-85 (2011).

1   trial from that of his codefendant.  (See SAP at 3-45.)[5]  The Court addresses each claim in

2   turn.

3   **A.      False Evidence by Prosecution**

4           Petitioner claims his due process rights were violated because the jury convicted him

5   based on numerous items of evidence "known to be false" by the prosecution.  (SAP at 3-17.)

6           A prosecutor violates due process by obtaining a conviction through evidence known

7   to the prosecution to be false or misleading.  Napue v. Illinois, 360 U.S. 264, 269 (1959).  To

8   succeed on a false evidence claim, a petitioner must show: "(1) the testimony (or evidence)

9   was actually false, (2) the prosecution knew or should have known that the testimony was

10  actually false, and (3) . . . the false testimony was material."  Hayes v. Brown, 399 F.3d 972,

11  984 (9th Cir. 2005).   Mere inconsistences in testimony, however, do not establish the

12  knowing use of perjured testimony.  Allen v. Woodford, 395 F.3d 979, 995 (9th Cir. 2005).

13  Even where there is a sharp conflict in the evidence, the prosecution may decide to proceed

14  to trial, thereby permitting the jury to resolve the conflict.  Imbler v. Pachtman, 424 U.S. 409,

15  426 n.24 (1976).

16          The Court next addresses the items of evidence Petitioner claims to be false.

17  **1.      Oakland Pediatrics Hospital**

18          Petitioner claims "photos and other medical evidence" relating to Jacinda's visit to

19  Oakland Pediatrics Hospital on January 3, 2002 was fabricated to corroborate Cuellar's story

20  that Jacinda was burned by Petitioner.   (SAP at 5.)

21          At the outset, the Court notes that Petitioner does not identify the specific items of

22  evidence he contends were fabricated or that the prosecution knew were falsified.  Even

23  accepting Petitioner's description of the record, that "several witnesses testified that Cuellar

24  decided to stick to her original story in order to regain custody of her children" (SAP at 4),

25  Petitioner's argument does no more than point to a conflict in the evidence that the jury was

26  entitled to decide, which evidentiary dispute is insufficient to establish the knowing use of

_____

28          [5]  The substance of petitioner's claims is set forth in a lengthy attachment to the SAP,
        the pages of which are numbered 1 through 45; the preceding pages are numbered
        (1) through (6).  (See SAP, Attachment A.)

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   false evidence.  See Allen, 395 F.3d at 995.

2          Accordingly, Petitioner is not entitled to habeas relief on this claim.

3      **2.      Calico Video**

4          Petitioner claims a depiction of the injury to Jacinda's hand, as seen in photographs

5   taken by the Berkeley Police Department and Oakland Pediatrics Hospital, was false and that

6   witnesses who testified on the basis of the injuries depicted in the photographs committed

7   perjury.  In support thereof, Petitioner contends such depiction appears different from the

8   depiction of the same injury as seen in a video recording of an interview with Jacinda at

9   Calico Child Abuse Center.  (SAP at 6-7.)  Specifically, Petitioner claims the photographic

10  evidence shows a "distinctive circular spared area of skin," indicating "intentional branding,"

11  whereas the video depicts no such "spared area" and only a "surface burn," which, according

12  to Petitioner, "appears to be a grazing injury, which would not be consistent with a direct

13  branding imprint."  (Id.)

14          Petitioner states he attempted to substantiate this claim by hiring a forensic

15  laboratory to "extract a still image" of Jacinda's hand injury from the video, but concedes

16  "[t]he angle of Jacinda's hand prevented a clear comparison."  (SAP at 7.)  Nevertheless,

17  Petitioner alleges, both he and his wife, as well as his grandmother, have all viewed the video

18  recording and determined that it does not depict the same injury as depicted in the

19  photographs.  (SAP at 6-8; Petitioner's Exs. 9, 12-13.)  Petitioner also points out that his

20  grandmother testified at trial that the photographs presented at trial did not depict the injuries

21  that she personally observed on the victim the day after the attack.  (SAP at 8; Petitioner's

22  Ex. 12.)

23          The assessment of the evidence by Petitioner and his family members does not

24  establish the prosecution knowingly introduced falsified photographs of the victim's hand

25  injury.  At best, it shows the evidence on the issue was in dispute, and, under such

26  circumstances, the jury was permitted to resolve the conflict.  See Allen, 395 F.3d at 995.

27          Accordingly, Petitioner is not entitled to habeas relief on this claim.

28

13

### 3.   Handwriting Expert

Petitioner claims Dr. Glann "presented false evidence." (SAP at 10-13.) In support thereof, Petitioner first states that after the trial he retained a handwriting expert who concluded that Dr. Glann's medical reports were written by the same person, thus contradicting her testimony that several of the reports, specifically, those of January 9, 11 and 24, 2002, were prepared by her partner, Dr. Davis (id. at 9); Petitioner further asserts said medical documents were introduced at Petitioner's preliminary hearing and trial "without any proof of authenticity" (id. at 10). Additionally, Petitioner claims that because Dr. Glann's medical records show the billing codes used for Jacinda's January 8, 2002 visit were consistent with a consultation lasting only ten to fifteen minutes, Jacinda's injuries could not have been as serious as Dr. Glann described. (Id. at 11.)

At the outset, the Court notes that Petitioner's claim that the subject medical records were not properly authenticated is not supported by the transcript of Dr. Glann's testimony, which demonstrates she was asked to authenticate those records and did so. (Index, Ex. P at 402-03.)

Further, Petitioner fails to make an adequate foundational showing that the documents Petitioner has offered in support of his petition are the same as the medical records comprising the exhibits introduced at trial. (Compare Petitioner's Ex. 14 (comprising six pages of documents) with Index, Ex. P. at 402 (describing trial exhibit as "four-page document").) Indeed, Dr. Glann was not questioned as to any medical records documenting treatment subsequent to Jacinda's January 8, 2012 visit. (See Index, Ex. P. at 403-10.)

Lastly, Petitioner's assertion, that Dr. Glann must have lied about the seriousness of Jacinda's injuries because of the length of time billed, is based on no more than speculation, both as to the meaning of the billing codes and the time needed for the treatment provided.

Consequently, Petitioner has failed to show Dr. Glann lied when she testified, let alone that the prosecutor knowingly presented false testimony.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

14

United States District Court

For the Northern District of California

### 4.    Pathologist

Petitioner claims that after the trial, he hired a forensic pathologist, Dr. John C. Hiserodt, to analyze the injuries shown in the prosecution photographs.  (SAP at 12.) Petitioner contends an unsworn opinion letter authored by Dr. Hiserodt "proves beyond a reasonable doubt that the prosecution presented false evidence to the jury in order to obtain [Petitioner's] conviction."  (Id.)

In addition to being unsworn, the letter is unaccompanied by a curriculum vitae and there is nothing provided, in either the letter itself or otherwise, to enable the Court to evaluate Dr. Hiserodt's qualifications with respect to the processing of photographs or to determine the reliability of his methodologies.  Assuming, however, the letter is accepted as an expert opinion, the Court briefly addresses the contentions contained therein.

### a.    Opinion Re: Dates on Photographs

Petitioner claims the date stamps on the photographs Nurse Practitioner Berriman testified she took of Jacinda on January 9, 2002, actually show they were in fact developed in 1987 and thus, Nurse Berriman's testimony must be false.  (SAP at 13.) The essence of Petitioner's contention is that Nurse Berriman used a photograph of another child's injuries, in some manner superimposed Jacinda's image thereon, and thereafter falsely testified in court that the photograph depicted Jacinda's injuries.  (Id.)

In support of this claim Petitioner submits a copy of a photograph (see Petitioner's Ex. 2) and cites to Dr. Hiserodt's response to the following question by Petitioner:  "Q1: Should an agency take photos on 1/9/2002, but have a date stamped 2/26/1987 on the front of the photos?"  (Petitioner's Ex. 22 at 1.)  Dr. Hiserodt responds:  "No, the date represents the time the photo is developed.  Dates on the photos indicate when the photo was printed.  The date can be printed on the back of the photo or on the front of the photo."  (Id.)  Petitioner's exhibit, however, even assuming it is an accurate copy of the trial exhibit, does not reflect the claimed inconsistency, nor does Dr. Hiserodt purport to have viewed any photograph in connection with said response, let alone offer an opinion that any such photograph was modified.

**b.      Opinion Re: Jacinda's Injuries**

Dr. Hiserodt opines that Jacinda's burns were not of a degree that would require debridement, i.e., surgical removal of the dead skin.  (Petitioner's Ex. 22 at 2.)  Petitioner contends Dr. Hiserodt's opinion contradicts Dr. Glann's testimony as to the severity of Jacinda's injuries.  (SAP at 12.)  Additionally, again relying on Dr. Hiserodt's letter, Petitioner contends that certain of Jacinda's injuries would have occurred "at least 48" hours earlier (id.), which timing, Petitioner further contends, contradicts all testimony regarding Jacinda's injuries because the jury was told the injuries occurred the night before the police were called.  Lastly, based on Dr. Hiserodt's opinion that certain of Jacinda's injuries as depicted in the photographs "would initially be painful" and warrant treatment with pain medication (Petitioner's Ex. 22), Petitioner contends that had Jacinda actually sustained serious injury, the police officers would have realized she needed immediate medical attention (SAP at 14).[6]

Dr. Hiserodt's opinion, which is based on his review of photographs, does not support a finding that false evidence was used to convict Petitioner.  First, Dr. Hiserodt's opinion as to the necessity of debridement, even if in disagreement with that of Dr. Glann, does not demonstrate a falsity in Dr. Glann's testimony that she in fact performed the debridement of Jacinda's wounds. (See Index, Ex. P at 409.)  Second, Dr. Hiserodt cautions that dating the time of injures from photographs is "not a precise science," and offers no opinion as to when Jacinda's injuries were in fact sustained.  (Petitioner's Ex. 22 at 2).  Finally, nothing in Dr. Hiserodt's opinion concerning whether Jacinda's injuries would have been painful supports Petitioner's conclusion that any witness who testified as to the severity of her observed injuries was offering false evidence.

In sum, Dr. Hiserodt's opinion raises, at best, a potential conflict in the evidence, which, as noted, does not suffice to demonstrate the knowing presentation of false evidence.

---

[6] Although Petitioner also contends Dr. Hiserodt opined in his letter that the injury to jacinda's eye "could not have been caused by the metal tube" (SAP at 13), there is nothing in Dr. Hiserodt's letter suggesting such a conclusion and, consequently, the Court does not address herein Petitioner's contention based thereon.

1   See e.g. United States v. Wolf, 813 F.2d 970, 976-977 (9th Cir. 1987.)

2          Accordingly, Petitioner is not entitled to habeas relief on this claim.

3          **5.     Temperature of Metal Tube**

4          Petitioner claims the prosecution expert, Dr. Crawford, perjured himself when "he

5   opined that the metal tube used to cause [Jacinda's] injuries was heated between several

6   hundred and several thousand degrees." (SAP at 15.)  According to Petitioner, Dr.

7   Crawford's testimony is "inherently untrue and impossible" because "[i]t is common

8   knowledge that home stoves do not reach several thousand degrees." (Id.)

9          Having reviewed the record, the Court finds Petitioner has inaccurately summarized

10  Dr. Crawford's testimony.  Dr. Crawford was asked if he had "any idea how hot the pipe

11  would have been" to cause the injuries depicted in the photographs he was shown.  He

12  replied:

13          Difficult question to answer with precision.  We know that, for example, hot
            water at 150 degrees can get a full thickness burn in a matter of a second or
14          two.  Water boils at about 212 degrees.  The flame on a stove actually burns at
            several thousand degrees.  So somewhere between 150 and several thousand
15          degrees the—a hot pipe could have been heated to something.  You know,
            whether that was 200 degrees or 500 degrees, I don't know.
16
                . . . .
17
            Having said that, whatever the temperature was, it clearly was too hot for
18          her to be in contact with and caused burn injuries to her skin."

19  (Index, Ex. O at 347-48.)

20          As the record demonstrates, Dr. Crawford testified that he did not know and could not

21  accurately estimate the temperature of the pipe used to burn Jacinda.  Further, contrary to

22  Petitioner's characterization, Dr. Crawford did not testify that the stove could reach several

23  thousand degrees; rather, Dr. Crawford testified that the "flame on a stove" burns at such

24  temperature.  (Id. at 347.)  What Dr. Crawford did conclude, however, is that the object

25  causing the burns, whatever its temperature, was "too hot" for human contact.  (Id. at 348.)

26  In short, there is no evidentiary basis for Petitioner's allegation that Dr. Crawford perjured

27  himself or that the prosecutor acted improperly in relying on such testimony.

28          Accordingly, Petitioner is not entitled to habeas relief on this claim.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

### 6.    Victim

Petitioner claims his conviction was based on false evidence provided by Jacinda.  In support thereof, Petitioner alleges that: (1) at the preliminary hearing, Jacinda testified she was touched only once with the hot stick, but that the prosecution nonetheless proceeded to elicit from Dr. Crawford testimony that the photos showed eight separate burns; (2) Jacinda's trial testimony regarding an injury to her hand was inconsistent with photographs and taken by Nurse Berriman; and (3) neither the prosecution nor defense counsel showed Jacinda or Cuellar the photographs of Jacinda's injuries.  Petitioner contends the prosecution's pursuit of a theory contrary to Jacinda's account and other evidence constituted prosecutorial misconduct, and that the failure to show the photographs to Jacinda or Cuellar suggests the prosecution and defense counsel "were aware that the photos were false."  (SAP at 15-16.)

Jacinda testified, however, that "Big Andre," i.e., Petitioner, was holding a metal stick that was "hot" and touched her on her body (Index, Ex. N at 230), and she spelled the words "legs," "arms," and "tummy" on a writing board in response to the prosecutor's inquiry as to where Petitioner had touched her with that object (id. at 230-33).  Such testimony was not inconsistent with the prosecution's theory.  Moreover, to the extent there was any inconsistency between Jacinda's trial testimony and the trial testimony of the medical witnesses, the jury was fully able to evaluate those inconsistencies based on the totality of the parties' respective presentations, including cross-examination.

In sum, the existence of any such arguable inconsistencies in the evidence, whether at the preliminary hearing or the trial, and/or any such decision by the prosecution as to the displaying of exhibits, is insufficient to demonstrate the prosecution's evidence was false, let alone knowingly so.

Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

### 7.    Officer Frederick

Petitioner claims the testimony of Officer Frederick, the initial responding officer, suggests that the photographs taken by Ann Wynn, a Berkeley Police Department technician, may not have been taken in Officer Frederick's presence and that the injuries observed by

United States District Court

For the Northern District of California

1    Officer Frederick were minor.  (SAP at 16-17.)  Based on such evidence, Petitioner

2    concludes said photographs as well as the medical testimony of Dr. Crawford and Nurse

3    Berriman were false.  (Id.)

4         The record, however, does not support Petitioner's assessment of the evidence.

5    Officer Frederick testified that he observed multiple burn marks on Jacinda's legs and hands

6    (Index, Ex. P. at 451-52), and Wynn, the technician, testified that she in fact took the

7    photographs in question (Index, Ex. N at 101, 103-07).  To the extent there was any

8    discrepancy between Officer Frederick's testimony and that given by Cuellar or the medical

9    experts, any such differences in recollection or opinion do not support a finding that the

10   prosecution knowingly introduced false evidence.  At best, they created a potential conflict in

11   the evidence for the jury to resolve.

12        Accordingly, Petitioner is not entitled to habeas relief on this claim.

13   **B.    <u>False Evidence by Codefendant</u>**

14        Petitioner claims his conviction was based on false evidence introduced through the

15   testimony of Cuellar, including the 911 tape of her call to police, and also on the testimony of

16   her cousin Evelyn Flores.  Additionally, he claims the conduct of Cuellar's trial attorney

17   violated his due process rights in various ways.  (SAP at 18-23.)

18        The Court is not aware of any United States Supreme Court authority holding the

19   presentation of false evidence by a codefendant or any conduct on the part of counsel

20   representing a codefendant establishes a due process violation.  Assuming, <u>arguendo</u>, that

21   <u>Napue</u> can be read to cover the conduct of a codefendant or counsel for a codefendant,

22   however, the Court next addresses Petitioner's claims concerning those individuals.  <u>See</u>

23   <u>Napue</u>, 360 U.S. at 269 (finding due process violation based on prosecution's knowing

24   submission of false evidence going to witness's credibility).

25        **1.    False 911 Tape**

26        Codefendant Cuellar introduced, without objection or challenge to its authenticity, the

27   tape recording of her 911 call on the morning of January 2, 2002.  (<u>See</u> Index, Ex. BB.)

28   Petitioner claims "the so-called 911 tape was false as proved by all available evidence" (SAP

**United States District Court**
For the Northern District of California

1   at 18), and that the tape was a "phony" to "buttress [Cuellar's] duress defense" (id. at 19).

2      The transcript of the call demonstrates that Cuellar told the dispatcher she was calling

3   because of a "domestic violence" situation (Index, Ex. BB at 2); further, contrary to

4   Petitioner's contention that there was no mention of a battered child, Cuellar told the

5   dispatcher "[petitioner] lost his cool last night, he hit me and he also hit her" (id. at 3).

6   Cuellar went on to tell the dispatcher that Petitioner had been hitting her for three to four

7   years, that she and her daughter both had marks from the previous night, and that she was

8   scared of Petitioner because he had threatened to kill her.  (Id. at 2-4.)  Petitioner contends

9   the prosecution's evidence as to the tape recording is false because Officer Frederick testified

10  only that he was responding to a call that a woman was locked in her house.  Petitioner's

11  characterization of the evidence is, again, inaccurate.  Officer Frederick unequivocally

12  testified that he responded to a call regarding domestic violence.  (Id. at 444.)  Moreover, to

13  the extent that there are any inconsistencies between Cuellar's testimony, the transcript of the

14  911 call, and/or Officer Frederick's testimony, such discrepancies are not indicative of

15  willful falsity.  See, e.g, United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997) (holding

16  inconsistencies in witness's statements do not establish testimony is false); United States v.

17  Flake, 746 F.2d 535, 539 (9th Cir. 1984) ("[I]nconsistency is not tantamount to perjury,

18  absent knowing falsehood.").

19      Accordingly, Petitioner is not entitled to habeas relief on this claim.

20      **2.      Evelyn Flores**

21      Petitioner contends Evelyn Flores, Cuellar's cousin, committed perjury when she gave

22  her address as a street in "Oakland."  (SAP at 21-22.)  He alleges his post-trial investigation

23  established that the address she gave is in Oxnard, not Oakland.  (Id. at 22.)  Such

24  discrepancy is not, however, a sufficient basis for a finding that the entirety of the witness's

25  testimony was false.  Whether or not the name of the city as reported constitutes an accurate

26  transcription of Flores' testimony, there is no showing that her address bears on a material

27  matter.  See Belmontes v. Brown, 414 F.3d 1094, 1115 (9th Cir. 2005), *rev'd on other*

28  *grounds*, Ayers v. Belmontes, 549 U.S. 7 (2006) (holding evidence is material for purposes

of <u>Napue</u> where there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury") (internal quotation and citation omitted).

Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 3.     Misconduct of Codefendant's Counsel

Petitioner claims codefendant Cuellar's counsel violated Petitioner's due process rights by (1) knowingly presenting a false 911 tape, (2) knowingly presenting false testimony from Cuellar and Flores, (3) representing Cuellar despite a "conflict of interest," and (4) "prejudicial[ly]" cross-examining Petitioner and presenting unauthenticated documents against him.  (SAP at 23.)

The first two of said claims are included in the claims discussed above and found unpersuasive by the Court.  The latter two claims likewise fail, for the reason that they are conclusory in nature and made without any supporting evidence.  <u>See</u> <u>Greeway v. Schrior</u>, 653 F.3d 790, 804 (9th Cir. 2011) (holding "cursory and vague claim cannot support habeas relief); <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir.), *cert. denied*, 513 U.S. 935, 115 S. Ct. 333 (1994) (holding "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief").

Accordingly, Petitioner is not entitled to habeas relief on this claim.

## C.     <u>Ineffective Assistance of Counsel</u>

Petitioner claims he received ineffective assistance of trial counsel; he alleges multiple grounds in support of said claim.  (SAP at 25-38.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  <u>Id.</u> at 687-88.  Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

United States District Court

For the Northern District of California

1    of the proceeding would have been different." Id. at 694.  "A reasonable probability is a

2    probability sufficient to undermine confidence in the outcome." Id.

3        A federal habeas court considering an ineffective assistance claim need not address

4    the prejudice prong of the Strickland test "if the petitioner cannot even establish

5    incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.

6    1998).  Conversely, the court "need not determine whether counsel's performance was

7    deficient before examining the prejudice suffered by the defendant as a result of the alleged

8    deficiencies." Strickland, 466 U.S. at 697.

9        A "doubly" deferential judicial review applies in analyzing ineffective assistance of

10   counsel claims under 28 U.S.C. § 2254.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11

11   (2011).  The rule of Strickland, i.e., that a defense counsel's effectiveness is reviewed with

12   great deference, coupled with AEDPA's deferential standard, results in double deference. See

13   Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010).  Put another way, when § 2254(d)

14   applies, "the question is not whether counsel's actions were reasonable[;] [t]he question is

15   whether there is any reasonable argument that counsel satisfied Strickland's deferential

16   standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011).  Moreover, because

17   Strickland's standard for assessing defense counsel's effectiveness is a "general" one, state

18   courts have "greater leeway in reasonably applying [that] rule," which in turn "translates to a

19   narrower range of decisions that are objectively unreasonable under AEDPA."  See Cheney,

20   614 F.3d at 995 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

21       The Court addresses in turn each of Petitioner's claims of ineffective assistance.

22       **1.    Inexperience**

23       Petitioner claims his retained trial counsel was inexperienced in criminal law, in that

24   his prior experience in that area consisted of only two jury trials. (SAP at 25.)  Petitioner

25   further claims that had he "known that [trial counsel] had virtually no experience in the area

26   of criminal law, [he] would not have hired him." (Id.)  Petitioner's claims fail to state a

27   cognizable claim of ineffective assistance of counsel.  As discussed above, the question is not

28   whether counsel had a certain level of experience, but whether counsel's performance fell

United States District Court

For the Northern District of California

1    below an "objective standard of reasonableness." See Strickland, 466 U.S. at 687-88; see also

2    Ortiz v. Stewart, 149 F.3d 923, 933 (9th Cir. 1998) (holding "an ineffective assistance claim

3    cannot be based solely on counsel's inexperience").

4            Accordingly, Petitioner is not entitled to habeas relief on this claim.

5            **2.        Failure to Investigate**

6            Petitioner claims his counsel failed to conduct a proper pre-trial investigation.  (SAP

7    at 25-26.)  In particular, Petitioner claims counsel "interviewed only one witness whom he

8    never subpoenaed, conducted no tests on physical evidence, and consulted with no medical

9    experts about the physical evidence pertaining to [P]etitioner's case." (Id.)

10           A defense attorney has a general duty to make reasonable investigations or to make a

11   reasonable decision that makes a particular investigation unnecessary.  See Strickland, 466

12   U.S. at 691; Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011); Turner, 158 F.3d at 456.

13   "'[A] particular decision not to investigate must be directly assessed for reasonableness in all

14   the circumstances, applying a heavy measure of deference to counsel's judgments.'"  Silva v.

15   Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 491).  Counsel

16   need not pursue an investigation that would be fruitless or might be harmful to the defense.

17   See Harrington v. Richter, 131 S. Ct. 770, 789-90 (2011).

18           Here, Petitioner has offered only his own conclusory statements, unsupported by any

19   factual foundation demonstrating his knowledge of what his trial counsel did or did not do

20   with respect to the investigation of his case, and, indeed, Petitioner's claim that his counsel

21   "conducted virtually no investigation"(SAP at 25) is belied by the fact that his counsel had a

22   defense investigative report prepared that Petitioner references in his Petition (see SAP at 28-

23   30).  Petitioner thus fails to show defense counsel's investigation was constitutionally

24   deficient.  See United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984) (holding

25   petitioner must make sufficient factual showing to substantiate claim of ineffective

26   assistance).  Moreover, because Petitioner fails to identify any evidence that a further

27   investigation would have unearthed, Petitioner fails to establish prejudice.

28           Further, to the extent Petitioner claims counsel failed to investigate the prosecution's

United States District Court

For the Northern District of California

1   use of purportedly fabricated evidence, Petitioner, as discussed above, fails to demonstrate

2   that any of the prosecution's evidence was false.  Consequently, as to such additional claim,

3   Petitioner likewise is unable to meet either prong of the <u>Strickland</u> test.

4        In sum, Petitioner has not shown the state court's decision as to any of petitioner's

5   claims asserting a failure to investigate involved either an unreasonable application of

6   Supreme Court law or an unreasonable determination of the facts.

7        Accordingly, Petitioner is not entitled to habeas relief on this claim.

8        **3.      Failure to Subpoena Favorable Witnesses**

9        Petitioner claims counsel was ineffective in failing to call the following witnesses:

10  (1) Susan Porter, (2) Keith Muhammad, (3) Salamah Muhammad, (4) Linda Muhammad, and

11  (5) Tasha Muhammad.  (SAP at 27-30.)

12       To succeed on a claim that counsel was ineffective in failing to call a favorable

13  witness, a federal habeas petitioner must identify the witness, provide the testimony the

14  witness would have given, show the witness was likely to have been available to testify and

15  would have given the proffered favorable testimony, and demonstrate a reasonable

16  probability that, had such testimony been introduced, the jury would have reached a verdict

17  more favorable to the petitioner.  <u>See</u> <u>Alcala v. Woodford</u>, 334 F.3d 862, 872-73 (9th Cir.

18  2003).  A petitioner's mere speculation that the witness would have given helpful

19  information if interviewed by counsel and called to the stand is not enough to establish

20  ineffective assistance.  <u>See</u> <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1087 (9th Cir.), <u>amended</u>, 253

21  F.3d 1150 (9th Cir. 2001).  In <u>Dows v. Wood</u>, 211 F.3d 480 (9th Cir. 2000), for example, the

22  Ninth Circuit denied a petitioner's claim that his counsel had been ineffective in failing to

23  investigate and call a witness, where the petitioner provided only his own "self-serving

24  affidavit" and no other evidence, such as "an affidavit from [the] alleged witness," that the

25  witness would have given helpful testimony.  <u>See</u> <u>id.</u> at 486-87; <u>cf.</u> Alcala, 334 F.3d at 872 &

26  n.3 (distinguishing, <u>inter alia, Dows</u>; finding ineffective assistance of counsel where

27  petitioner submitted interviews reflecting testimony absent witnesses would have provided).

28       Here, as to Susan Porter, the mother of Petitioner's son Andre (<u>see</u> SAP at 28;

24

Petitioner's Ex. 42), Petitioner submits an affidavit in which Porter states that prior to Petitioner's trial she was contacted by Deputy McIntyre, a representative of the prosecution. (Petitioner's Ex. 42). Porter states therein she was asked whether Petitioner had ever been abusive toward Andre, and that she responded, "No." (Id.) Porter further states she informed Deputy McIntyre that Cuellar was abusive toward Andre. (Id.) Petitioner asserts trial counsel was aware of Porter's potential testimony and should have called her as a witness to impeach Cuellar, who, according to Petitioner, testified that Petitioner had abused Andre. (SAP at 28.)

As a preliminary matter, the Court notes that nowhere in her affidavit does Porter state she was available and willing to testify for Petitioner at the trial. Cf. Alcala, 334 F.3d at 872-73. As to whether Porter, even if available and willing to testify, would have impeached Cuellar, the Court further notes that the trial was not about whether Petitioner abused Andre or Samaya, his biological children, nor was Petitioner on trial for abusing all children. The trial was about the abuse and torture of one child, Jacinda. Consequently, in weighing whether Porter's testimony would have been helpful to impeach Cuellar, petitioner's counsel reasonably could have determined the risks outweighed any potential benefit, particularly given the relationship between Porter and Petitioner. See Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir. 1995) (noting, "[a]s a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias"). Further, given the overwhelming evidence against Petitioner, any contradiction of Cuellar's testimony on the issue of whether Petitioner abused his own son, who did not reside with Petitioner and Cuellar at the time, was not likely to have significantly impacted her credibility or the jury's verdict. Consequently, Petitioner has not shown the result of the proceeding would have been different had defense counsel called Porter to testify.

The other four potential witnesses identified by Petitioner were either associated with Jacinda's school (Keith, Salamah, and Linda Muhammad) or babysat for her (Tasha Muhammad). (SAP at 28-29; Petitioner's Ex. 41.) Petitioner claims these witnesses should have been called to testify because, according to a defense investigator's report, they stated

1    they had never seen any signs of physical abuse on Jacinda.  (Id.)

2    Because Petitioner failed to submit from any of the above-referenced four witnesses a

3    declaration or affidavit setting forth the testimony they were prepared and willing to give at

4    trial, the Court need not address said witnesses further.  See Strickland, 466 U.S. at 694; cf.

5    Alcala, 334 F.3d at 872-73.  The Court notes, however, that the issue at trial was not whether

6    the victim suffered burns, which was undisputed, but, rather, who inflicted those injuries.

7    Nothing in the defense investigative report indicates that any of these four witnesses had any

8    information bearing on the answer to that question.  Moreover, because the burns were

9    located on Jacinda's stomach, thigh and arm, those injuries may well not have been readily

10    visible as they could have been easily covered by her clothing.

11    Accordingly, Petitioner is not entitled to habeas relief on this claim.

12    **4.    Failure to Impeach Witnesses**

13    Petitioner claims counsel inadequately impeached Evelyn Flores, Yenci Santiago, and

14    Jacinda.  (SAP 30-31.)

15    Upon a review of the record, the Court finds counsel's performance as to said

16    witnesses was not deficient.  With respect to both Flores and Santiago, Petitioner contends

17    counsel should have produced the defense investigator to testify to their statements that they

18    had no reason to believe Petitioner had abused Jacinda.  (See Petitioner's Ex. 41.)  Flores,

19    however, never testified that Petitioner abused Jacinda, but only that Jacinda's personality

20    changed after Petitioner and Cuellar started living together (Index, Ex. R at 900).  Similarly,

21    with respect to Santiago's testimony, the Court of Appeal found, "there [was] no indication

22    in the record before [it] that evidence existed with which to impeach Santiago" (Index, Ex. A

23    at 17), and the record before this Court does not warrant a finding that the Court of Appeal

24    was unreasonable in reaching that conclusion.  In particular, Santiago, like Flores, offered no

25    testimony to the effect that Petitioner was physically abusive toward Jacinda.  In short, there

26    was no impeachment value in either witness's statement to a defense investigator that she had

27    no reason to believe Petitioner had abused Jacinda, nor was counsel ineffective in not

28    attempting to introduce any such out-of-court statement.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    Petitioner next contends his trial counsel should have been more aggressive in

2  attacking the credibility of Jacinda, who was five at the time of the incident and seven at the

3  time of trial.  From the record, it appears counsel's strategy was to attempt to show Jacinda's

4  testimony had been coached by her mother, Cuellar (see, e.g., Index, Ex. T at 1186; Ex. U at

5  1360-62) and, in that regard, to portray Cuellar as a mother desperate not to have her child

6  taken from her (see id.).  Petitioner's disagreement with counsel's strategy is not a cognizable

7  basis for a claim of ineffective assistance.  It is well settled that "great deference" must be

8  given to counsel's strategic decisions concerning how to cross-examine and impeach any

9  particular witness.  See Dows, 211 F.3d at 487.

10    Accordingly, Petitioner is not entitled to habeas relief on this claim.

11    **5.      Failure to Suppress Evidence**

12    Petitioner claims his trial counsel also was ineffective in failing to move to suppress or

13  exclude various items of evidence. (SAP at 31-33.)

14    In order to establish ineffective assistance based on defense counsel's failure to

15  litigate a Fourth Amendment issue, petitioner must show: (1) there existed a meritorious

16  motion to suppress, and (2) there is a reasonable probability that the jury would have reached

17  a different verdict absent the introduction of the unlawful evidence.  See Ortiz-Sandoval v.

18  Clarke, 323 F.3d 1165, 1170 (9th Cir. 2003) (citing Kimmelman v. Morrison, 477 U.S. 365,

19  375 (1983).  The failure to file a meritorious suppression motion, however, "does not

20  constitute per se ineffective assistance of counsel."  Kimmelman, 477 U.S. at 384.

21    The Court addresses each asserted ground in turn.

22    **a.      Illegal Search & Seizure**

23    Petitioner contends his counsel should have argued that the search of his shared

24  apartment with Cuellar was unlawful because the search was not consensual. (SAP at 31-32.)

25  Petitioner fails, however, to specify any evidence that was discovered in such allegedly

26  unlawful search and would have been subject to suppression.  The record reflects that the

27  only tangible evidence retrieved from Petitioner's apartment was the metal tube used to burn

28  Jacinda, evidence that Cuellar recovered and voluntarily turned over to the responding

United States District Court

For the Northern District of California

officers.  (Index, Ex. P at 453.)  Moreover, contrary to Petitioner's allegations, Officer

Frederick's entry into the apartment was consensual.  In particular, the record reflects that

Cuellar, as discussed above, called 911 and sought help from the police to free her from her

home.  (Index, Ex. Q at 653.)  Trial counsel was not deficient in not bringing a suppression

motion that lacked merit.

### b. Codefendant's Involuntary Confession

Petitioner contends counsel should have moved to suppress Cuellar's initial statement

to police as the product of an involuntary confession and the fruit of an illegal entry.  (SAP at

32.)  As discussed, the record reflects no basis for an argument that the police entry was

illegal, nor does it reflect any basis for an argument that Cuellar's statement was coerced.

Indeed, as noted, the transcript from the 911 call reveals that Cuellar told the dispatch

operator that she and her daughter were victims of domestic violence.  Given the state of the

record, there would have been no basis for a motion to suppress Cuellar's initial statement to

police as involuntary.  See United States v. Ceccolini, 435 U.S. 268, 276 (1978) ("Witnesses

can, and often do, come forward and offer evidence entirely of their own volition.").  Trial

counsel thus acted reasonably in not moving to suppress Cuellar's initial statement to the

police.

### c. Evidence of Injuries

Petitioner contends a successful challenge to the entry of the residence would have led

to suppression of all evidence of Jacinda's injuries.  (SAP at 32.)  As discussed above,

Petitioner has failed to show any factual basis upon which to conclude the entry was

unlawful.  Further, evidence of Jacinda's injuries would have been discovered and introduced

through other, independent sources such as the medical professionals who treated her as well

as through Jacinda's own testimony.  See Ceccolini, 435 U.S. at 276, 280.  Trial counsel was

not deficient in not moving to suppress evidence of Jacinda's injuries.

### d. Codefendant's Testimony

Petitioner contends trial counsel was ineffective "for not seeking to have codefendant

Cuellar's trial testimony excluded because of the continued coercion she was under."  (SAP

at 33.)  As a codefendant, with the same Fifth Amendment rights as Petitioner, Cuellar could not be "coerced" into testifying; rather, Cuellar voluntarily took the stand in her own defense. (Index, Ex. Q. at 561.)  Trial counsel thus was not deficient in not moving to suppress Cuellar's testimony.

### e.   Victim's Testimony

Petitioner contends counsel also was ineffective "for not seeking to exclude Jacinda's testimony because it was involuntary and given under coercion." (SAP at 34.)  Petitioner submits no evidence or other support for a finding that Jacinda's testimony was coerced. Moreover, trial counsel had the opportunity to, and indeed did, cross-examine Jacinda on her motivation for testifying against Petitioner, and the jury was able to judge Jacinda's credibility.  Petitioner thus fails to show counsel was ineffective in failing to move for the exclusion of Jacinda's testimony.

### f.   Petitioner's Confession

Petitioner contends counsel should have moved to suppress Petitioner's statement to Shelly Mazer, a Child Protective Services worker who testified Petitioner had admitted to her that he had impulsively burned Jacinda with a hot metal pipe. (See SAP at 35-37; see also Index, Ex. U at 1593-1600.)

In that regard, petitioner, citing section 355.1(f) of the California Welfare and Institutions Code, first contends Mazer's testimony was inadmissible as a matter of law. Petitioner's reliance on section 355.1(f), however, is misplaced.   Section 355.1(f) provides: "Testimony by a parent or guardian, or other person who has care or custody of the minor made the subject of a [child custody proceeding] under section 300 [of the Welfare and Institutions Code] shall not be admissible as evidence in any other action or proceeding." Said section is inapplicable here because Petitioner's statement to Mazer was made during an interview, approved by petitioner's counsel (SAP at 36), and was not "testimony." Moreover, there is no evidence that Petitioner was ever recognized as Jacinda's legal guardian nor is there evidence that he had any custodial rights with respect to her.

Petitioner next contends his statement to Mazer falls within California's

Case 3:09-cv-00647-MMC   Document 28   Filed 02/25/13   Page 30 of 37

psychotherapist-patient privilege.  (SAP at 35.)  Petitioner's reliance on such privilege is

misplaced, however, as there is no evidence that Mazer was acting as Petitioner's therapist or

that he made the admissions to her in the course of a therapeutic relationship and with the

expectation of confidentiality.  See Cal. Evid. Code § 1012 (defining "confidential

communication" for purposes of psychotherapist-patient privilege).  Indeed, Petitioner's

allegations, as set forth below, show he spoke to Mazer, who, prior to the interview, clearly

identified herself as a "Child Welfare Worker" (see Petitioner's Ex. 47), with the hope that

his cooperation would help him regain custody of his children:

> When petitioner's counsel advised him to speak to Ms. Mazer, it was because
> of Ms. Mazer's offer for help as a social worker as evidenced by the letters she
> sent to petitioner's counsel (exhibit #48).  Therefore, petitioner only spoke to
> Ms. Mazer[] because he was under the impression that it would aide him in
> regaining custody of his children and providing his family information so that
> his family would also have an opportunity to visit the children.

(SAP at 36.)

Petitioner also claims the introduction of Mazer's testimony was in violation of

Massiah v. United States, 377 U.S. 201 (1964).  In Massiah, the Supreme Court held a

defendant's Sixth Amendment right to counsel is violated when the government introduces

statements that a government agent deliberately elicited from an indicted defendant outside

the presence of defense counsel.  Id. at 206.  Consequently, to establish a Sixth Amendment

violation under Massiah, Petitioner must show Mazer was acting as an agent for the

prosecution and that she "deliberately elicited" incriminating statements from Petitioner for

such purpose.  See id.  Petitioner offers no evidence to support his claim that Mazer

deliberately elicited incriminating statements from him as an agent of the prosecution.

Rather, Petitioner makes the following conclusory allegation:

> Ms. Mazer obviously had no intention of using petitioner's statement in
> juvenile proceedings.  There is no mention of petitioner's statement in any of
> the CPS reports.  In fact, the reports consistently state that petitioner never
> made his position known to any of the social workers.  The first time Ms.
> Mazer disclosed that she had a conversation with petitioner was during the
> criminal trial even though the juvenile proceedings were ongoing and she had
> over a year to information the juvenile courts of her conversation with
> petitioner.

(SAP at 37.)  Moreover, the record contradicts Petitioner's allegation.  Mazer testified that

30

**United States District Court**
For the Northern District of California

1    her investigation of Petitioner and the child abuse claims against him was on behalf of the

2    Alameda County Department of Social Services for purposes of a dependency investigation.

3    (Index, Ex. Q. at 1593.)  There is no evidence she was working as an agent on behalf of the

4    prosecution for purposes of Petitioner's criminal trial.

5          Lastly, Petitioner contends Mazer "used her position as a social worker and the threat

6    of holding petitioner's children hostage to force him to make an involuntary admission."

7    (SAP at 37.)  Petitioner makes such conclusory claim without offering any supporting

8    evidence of the alleged threat.

9          Petitioner thus has demonstrated no basis upon which his statement to Mazer could

10   have been suppressed.  Moreover, the record shows trial counsel, in an effort to keep the

11   statement out of evidence, did object to Mazer's testimony as "hearsay," and that his

12   objection was overruled by the trial judge.  (Index, Ex. U at 1595.)  Accordingly, trial

13   counsel was not ineffective in failing to move to suppress Mazer's testimony.

14                 **g.      CALICO Video**

15         Petitioner, citing Crawford v. Washington, 541 U.S. 36 (2004), contends his counsel

16   should have moved to suppress the videotape of the interview of Jacinda conducted in the

17   presence of Officer Jamison at the CALICO office, as violative of his rights under the

18   Confrontation Clause.  See id. at 68 (holding out-of-court statements that are testimonial in

19   nature are barred, under the Confrontation Clause, unless witness is unavailable and

20   defendant had prior opportunity to cross-examine witness).  Petitioner's reliance on Crawford

21   is misplaced.  Crawford prohibits the introduction of certain types of out-of-court statements

22   made by declarants who do not testify at trial.  See id. at 59, n.9 (holding "when the declarant

23   appears for cross-examination at trial, the Confrontation Clause places no constraints at all on

24   the use of his prior testimonial statements").  Here, both Jacinda and Officer Jamison testified

25   and were subject to cross-examination about Jacinda's out-of-court statements.

26         In sum, the record demonstrates no basis for suppression or exclusion of any of the

27   items of evidence Petitioner identifies.  Accordingly, the Court finds counsel was not

28   ineffective in failing to make non-meritorious motions seeking such suppression or

31

exclusion.  See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (holding "the failure to take a futile action can never be deficient performance").

Accordingly, Petitioner is not entitled to habeas relief on this claim.

**D.    Prosecutorial Misconduct**

Petitioner alleges the prosecutor engaged in misconduct by (1) having another district attorney vouch for the credibility of Jacinda, and (2) making misstatements of law during closing argument.  (SAP at 40-43.)

The standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process.  Darden v. Wainwright, 477 U.S. 168, 181 (1986). A criminal defendant's due process rights are violated only if the misconduct renders the trial fundamentally unfair.  Id. at 181.  Relief is limited to cases in which the petitioner can establish that the misconduct resulted in actual prejudice.  Johnson v. Sublett, 63 F.3d 926, 930 (1995).  Put another way, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

The Court addresses each allegation in turn.

**1.    Vouching for Jacinda's Credibility**

Petitioner claims the prosecutor "vouched" for the credibility of Jacinda through the testimony of Deputy District Attorney Ursula Dickson, who handled the case at the preliminary hearing.  (SAP at 40.)

A prosecutor may not vouch for the credibility of a witness.  United States v. Moreland, 604 F.3d 1058, 1066 (9th Cir. 2010.)  Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. United States v. Young, 470 U.S. 1, 7 n.3, 11-12 (1985); United States v. Parker, 241 F.3d 1114, 1119-20 (9th Cir. 2001).  To warrant habeas relief, prosecutorial vouching must so infect the trial with unfairness as to make the resulting conviction a denial of due process. Davis v. Woodford, 384 F.3d 628, 644 (9th Cir. 2004).

32

United States District Court

For the Northern District of California

Here, Dickson testified at trial that she interviewed Jacinda on at least four occasions and Jacinda consistently stated Petitioner had burned her with a hot iron.  (Index, Ex. V at 1565-66.)  Under examination by Cuellar's counsel, Dickson further testified that she never heard Jacinda say Cuellar had burned her.  (Index, Ex. V at 1587.)  Dickson's testimony is not "vouching" as defined by the Supreme Court.  Young makes clear that prosecutorial "vouching" for a witness consists of the prosecutor's personal assurance of the witness's credibility, in the form of "argument" and "opinion."  See Young, 470 U.S. at 19.  Here, the record reflects that Dickson testified as a percipient witness and was subject to cross-examination.  The Court is not aware of any prohibition against a prosecutor offering percipient testimony on a matter such as a witness's prior consistent or inconsistent statements.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 2.    Misstatements of Law During Closing Argument

Petitioner claims the prosecutor "misstated the law" on two occasions during closing argument. (SAP at 41.)  With respect to the charge of torture, petitioner first alleges the prosecutor improperly stated that a "sadistic purpose" could be shown by Petitioner's desire to satisfy his anger.  (Id.)  Second, Petitioner alleges that the prosecution misstated the element of "cruel or extreme pain" by suggesting it could shown by an intent to humiliate. (SAP at 42.)

Prosecutorial misconduct merits habeas relief only where the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.  Greer v. Miller, 483 U.S. 756, 765 (1987); see also Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995) (holding "[t]o constitute a due process violation, the prosecutorial misconduct must be so severe as to result in the denial of [the petitioner's] right to a fair trial.") (citation omitted), *cert. denied,* 516 U.S. 1051 (1996).  In fashioning closing arguments, prosecutors are allowed reasonably wide latitude. United States v. McChristian, 47 F.3d 1499, 1507 (9th Cir. 1995).  "The arguments of counsel are generally accorded less weight by the jury than the court's instructions and must be judged in the context of the entire argument and the

United States District Court

For the Northern District of California

1   instructions." Ortiz-Sandoval v. Gomez, 81 F.3d 891, 898 (9th Cir. 1996).  On habeas

2   review, a federal court will not disturb a conviction unless the alleged prosecutorial

3   misconduct had a substantial and injurious effect or influence in determining the jury's

4   verdict.  See Burks v. Borg, 27 F.3d 1424, 1431 (9th Cir. 1994), *cert. denied,* 513 U.S. 1095

5   (1995).

6          Petitioner, as discussed, was charged with the crimes of torture and child abuse under,

7   respectively, sections 206 and  273(a) of the California Penal Code.  In his closing

8   instructions, the trial judge instructed the jury that under California law, the crime of torture

9   consists of the infliction of great bodily injury on another "with the intent to cause cruel or

10  extreme pain or suffering for the purpose of revenge, extortion, persuasion, or for any

11  sadistic purpose."  (Index, Ex. W at 1794.)  The phrase "sadistic purpose" means "the

12  infliction of pain on another person for the purpose of experiencing pleasure." People v.

13  Raley, 2 Cal. 4th 870, 901 (1992). The pleasure derived from the infliction of pain on another

14  need not be sexual in nature, People v. Aguilar, 58 Cal. App.  4th 1196, 1203 (1997);

15  "sadistic purpose" may encompass a person's "perverse pleasure" in harming another or in

16  controlling another's behavior, People v. Healy, 14 Cal. App. 4th 1137, 1141-1142 (1993).

17         In her rebuttal remarks, the prosecutor stated the following:  "You could find that

18  [Petitioner] did it to satisfy his own anger.  You could find a sadistic purpose was in trying to

19  control Jacinda's behavior.  Or you could even find that he got some sort of perverse pleasure

20  out of this.  All of these are sadistic purposes."  (Index, Ex. W at 1775.)  At the outset, the

21  Court notes that the prosecutor's argument is somewhat ambiguous, as the prosecutor

22  immediately prefaced these comments with: "I gave you at least three different purposes

23  which you could find here as to [Petitioner]" (id.) (emphasis added); as noted, the trial court

24  instructed the jury as to the several different purposes that could support a finding of torture,

25  including "revenge" and "persuasion" (id. at 1794).  In any event, the prosecutor's closing

26  remarks, considered in the context of the evidence before the jury, were not inconsistent with

27  California law.  In particular, the record established that Petitioner was extremely angry at

28  Cuellar for punishing Samaya, his biological daughter, for something he believed Jacinda had

done.  As the Court of Appeal, in summarizing Cuellar's testimony, noted:

> On January 1, 2002, [Petitioner] went over to the home of his mother, Nancy Jackson, in Hayward to see her new car.  Unbeknownst to Cuellar, [Petitioner] had secretly set up a video camera in the house, to keep her and the kids under surveillance while he was gone.  When [Petitioner] got back later that evening, he asked Cuellar if the victim had done her homework and gone to bed the way he had ordered.  Cuellar said yes.  [Petitioner] got a videotape out of the machine and watched it.  It showed the victim telling Cuellar that Samaya had been playing with the dresser drawers and had pulled one of them out.  Cuellar then slapped Samaya on the hand three times, and they all put the clothes back in the drawer.  [Petitioner] got mad and claimed that Cuellar was abusing Samaya and was treating the victim better than Samaya.  [Petitioner] claimed that the victim pulled the drawer out and blamed it on Samaya, and he told Cuellar to wake up the victim for questioning, which Cuellar did.

(Index, Ex. A at 5.)  Indeed, the above discussion regarding Petitioner's motive for punishing Jacinda is consistent with Petitioner's own recitation of the events as recounted by Mazer, the child welfare worker.  In his interview with Mazer, Petitioner stated he had put a video camera in Jacinda's room because he was concerned that "Jacinda was beating Samaya" and further stated he saw Jacinda pull a drawer open and hit Samaya on the head.  (Index, Ex. U at 1596.)  Given such evidence, the jury reasonably could have found Petitioner burned Jacinda with the hot metal tube as an act of outrage and revenge against Cuellar for what he perceived as her unjust punishment of his daughter, Samaya.  That same evidence, as well as evidence indicating Petitioner's history of cruel behavior, also would support a finding that Petitioner, for purposes of his own perverse pleasure, caused Jacinda to experience extreme pain.

In any event, the prosecutor's comments, even if deemed improper, do not rise to the level of a due process violation.  In determining whether improper comments rise to such level, courts consider:  (1) the weight of the evidence of guilt, see Young, 470 U.S. at 19; (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, see Giglio v. United States, 405 U.S. 150 154 (1972); and whether the prosecutor misstated or manipulated the evidence, see Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Here, the evidence of Petitioner's guilt, as discussed above, was particularly strong, and included a confession.  (See Index, Ex. U at 1595-98.)  Moreover, as noted, arguments by

counsel are "generally accorded less weight by the jury than the court's instructions," <u>see</u> <u>Ortiz-Sandoval</u>, 81 F.3d at 898, which instructions, in this case, clearly and fully informed the jury as to the elements of the offenses charged.

Petitioner next claims the prosecution incorrectly stated the element of "cruel or extreme pain" could be shown by an intent to humiliate. Petitioner, however, misconstrues the prosecutor's argument. In closing, the prosecutor stated: "There can be another purpose in addition to the purpose of causing cruel or extreme pain. If he also intended to humiliate her, that's fine, as long as this is one of his purposes to cause extreme pain and cause suffering. That's enough. Here, obviously, there's some humiliation as well." (Index, Ex. W at 1650-51.) By the above-quoted argument, the prosecutor never suggested that an intent to humiliate could substitute for an intent to inflict extreme pain. Rather, she argued that if Petitioner had a dual purpose, the additional purpose, such as humiliation, would not constitute a defense to a charge of torture provided Petitioner also had as a purpose infliction of extreme pain. <u>See</u> <u>People v. Jung</u>, 71 Cal. App. 4th 1036, 1042 (1999) ("That defendants may have intended to humiliate [the victim], as well as cause him pain and suffering, does not defeat their convictions for torture.").

Accordingly, Petitioner is not entitled to habeas relief on this claim.

**E.** **<u>Severance Motion</u>**

Petitioner claims the trial court erred by denying his motion to sever his trial from that of Cuellar, which motion was made on the ground that Petitioner and Cuellar had mutually antagonistic defenses. (SAP at 44-45.) As discussed, Petitioner can prevail on this claim only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). "[T]here is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses." <u>Runningeagle v. Ryan</u>, No. 07-99026, slip op. 8233, 8257 (9th Cir. July 18, 2012).

Accordingly, Petitioner is not entitled to habeas relief on this claim.

United States District Court
For the Northern District of California

**F.      Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).  To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Specifically, if a court denies a petition, a certificate of appealability may only be issued "if jurists of reason could disagree with the district court's resolution of [the petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003); see also Slack v. McDaniel, 529 U.S. 473, 484 (2000). While a petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part."

Here, Petitioner has not made the requisite showing, and, accordingly, a certificate of appealability will be denied.

## V.  CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.  The Petition for a Writ of Habeas Corpus is hereby DENIED.

2.  A Certificate of Appealability is hereby DENIED.

3.  The Clerk shall enter judgment in favor of respondent and close the file.

4.  Additionally, the Clerk is directed to substitute Warden Vimal Singh on the docket as the respondent in this action.

IT IS SO ORDERED.

Dated: February 25, 2013

_____
MAXINE M. CHESNEY
United States Senior District Judge

*United States District Court*

For the Northern District of California

37